IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| ANGELO JOSEPH COMER, | Case No. 4:23-cv-650 |
| Plaintiff, | |
| v. | MAGISTRATE JUDGE THOMAS M. PARKER |
| COMMISSIONER OF SOCIAL SECURITY, | **MEMORANDUM OPINION AND ORDER** |
| Defendant. | |

Plaintiff, Angelo Joseph Comer, seeks judicial review of the final decision of the Commissioner of Social Security, denying his application for supplemental security income ("SSI") benefits under title XVI of the Social Security Act. This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and the parties consented to my jurisdiction under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73. ECF Doc. 10. Because the Administrative Law Judge ("ALJ") applied proper legal standards and reached a decision supported by substantial evidence, the Commissioner's final decision denying Comer's application for SSI must be affirmed.

I.      **Procedural History**

On April 22, 2021, Comer filed an application for SSI. (Tr. 15, 54, 64, 177). Comer alleged a disability onset date of August 10, 2019, (Tr. 15, 55, 64, 194, 215), and asserted that he was disabled due to epilepsy, grand mal seizures, syncope (fainting), depression, anxiety, and paranoia, (Tr. 55, 64, 198). The Social Security Administration denied Comer's application at the initial level (Tr. 55-63), and upon reconsideration (Tr. 64-71). He then requested a hearing.

(Tr. 119-120). On February 1, 2022, ALJ Paula Goodrich heard the matter via telephone (Tr. 31-53), and found Comer not disabled under section 1614(a)(3)(A) of the Social Security Act in a March 18, 2022 decision. (Tr. 15-26). On February 10, 2023 the Appeals Council denied further review, making the ALJ's decision the final decision of the Commissioner. (Tr. 1-6). On March 28, 2023, Comer filed a complaint to obtain judicial review. ECF Doc. 1.

## II. Evidence

### A. Personal, Educational, and Vocational Evidence

Comer was born on June 6, 1994 and was 25 years and 2 months old on the alleged onset date. (Tr. 55, 64, 177, 194). Comer had a history of special education and completed his education through the 6th grade. (Tr. 62, 71, 199). Comer had past work as a maintenance worker from March 2019 to August 2019. (Tr. 199).

### B. Relevant Medical and Opinion Evidence

Neither party contests the objective medical evidence, Comer's subjective symptom complaints and testimony, or the medical opinion evidence. Nor do they contest the ALJ's summary of it. *See generally* ECF Doc. 7; ECF Doc. 9; ECF Doc. 11. Independent review does not reveal any material inconsistencies between the ALJ's summary of such evidence and the record before this court. *Compare* (Tr. 21-25), *with* (Tr. 54-72, 194-222, 239-825). Because of the limited nature of the parties' contentions, an independent recitation of the medical records within the administrative transcript is unnecessary. Consequently, I adopt the following summary of the evidence from the ALJ's decision.[1]

---

[1] *See Biestek v. Comm'r of Soc. Sec.*, No. 16-CV-10422, 2017 WL 1214456, at *1-2 (E.D. Mich. Feb. 24, 2017) (adopting an ALJ's summary of medical evidence and hearing testimony), *adopted by* 2017 WL 1173775 (E.D. Mich. Mar. 30, 2017), *aff'd by* 880 F.3d 778 (6th Cir. 2017), *aff'd by* 139 S. Ct. 1148, 203 L. Ed. 2d 504 (2019). *See also Paulin v. SSA*, 657 F. Supp. 2d 939, 942 (M.D. Tenn. 2009); 207 F. Supp. 3d 1174, 1177; *Hase v. Colvin*, 207 F. Supp. 3d 1174, 1177 (D. Or. 2016).

The claimant describes recurrent *grand mal* seizures, which he ascribes to epilepsy ([Tr. 55]). He reports chronic depression and anxiety ([Tr. 55]), adversely affecting his ability to get along with others, maintain focus ([Tr. 317]) and employ his memory ([Tr. 316]).

In terms of the claimant's alleged juvenile myoclonic epilepsy, the claimant does carry this as a part of his past medical history ([Tr. 282]). Electroencephalographic examination, dated March 6, 2019, was consistent with generalized epilepsy ([Tr. 340]). While this history would be consistent with his reports of chronic seizures, the record, when considered as a whole, is not supportive of the contention that the existence of this impairment would be preclusive of all types of work.

Diagnostic imaging of the claimant's brain, dated August 5, 2018, reported normal findings ([Tr. 283]).

The claimant has been on a stable regimen of anti-epileptic drugs ([Tr. 200]), ([Tr. 200]), and ([Tr. 220]), used without report of side effects ([Tr. 210]), ([Tr. 220]). As measured by blood tests included in the record ([Tr. 301]), ([Tr. 392]), ([Tr. 432]), the claimant has been compliant with use of this medication. The medications must be accounted as effective, in that the record describes only three recurrences of seizures since September 2019 ([Tr. 282]), ([Tr. 340]), ([Tr. 607]).

The claimant reported development of hand tremors as early as November 2020; however, he felt able to "live with them" at that time ([Tr. 282]) and described them as episodic and "very minor" in October 2021 ([Tr. 607]). Investigation, by video electroencephalograph, caught these episodes on film, but they were not accompanied by eleptiform discharges ([Tr. 347, 349]). Clinically, these tremors improved/resolved with distraction ([Tr. 344, 354]).

Clinical examinations included in the record have consistently, albeit not universally, reported either mildly adverse, or benign findings, including one dated July 30, 2021, which indicated increased tone in the upper extremities, but improved with distraction, and that the claimant was alert and oriented in three spheres, able to follow commands, with cranial nerves intact, normal strength throughout, normal reflexes sensory function and coordination ([Tr. 343-344]).

In sum, the evidence would indicate that the symptom limitations relevant to these impairments are not as severe as alleged. Where the claimant would be restricted to the performance of work tasks, conducted in a setting where he would frequently handle and finger with the bilateral upper extremities; where the claimant would never climb ladders, ropes or scaffolds; and, where the claimant would avoid all exposure to unprotected heights, dangerous moving machinery, and commercial driving, adequate allowance will have been made for these impairments.

In terms of the claimant's alleged psychological disorders, he was diagnosed with bipolar one disorder and alcohol use disorder, each on November 22, 2021 ([Tr. 422]), with major depressive disorder, and generalized anxiety disorder, each on July 23, 2021 ([Tr. 325]), with cluster B personality disorder, on November 15, 2021 ([Tr. 427]), with post[-]traumatic stress disorder, on August 13, 2021 ([Tr. 403]), with mild neurocognitive disorder, secondary to another medical condition, on June 2, 2021 ([Tr. 320]) and with alcohol abuse, on November 15, 2021 ([Tr. 427]). While these findings would be consistent with the claimant's allegations of depression and anxiety, the record, when considered as a whole, is not supportive of the contention that the existence of this impairment would be preclusive of all types of work.

* * *

Notwithstanding this lack, mental status examinations included in the record have consistently, albeit not universally, reported either mildly adverse, or benign findings, such as one dated June 7, 2021, which indicated that the claimant presented as alert and well groomed, with appropriate hygiene, eye contact, normal speech, an appropriate mood and affect, with no suicidal or homicidal ideation, no overt anxiety, no psychoses, with good concentration, and no deficits of insight and judgment ([Tr. 317-318]), or one dated November 17, 2021, which reported that the claimant was well-appearing, with normal behavior and motor activity, attentive, with good eye contact, normal speech, a "great" mood, bright, appropriate, pleasant affect, linear thought process, no loose associations, no suicidal or homicidal ideation, no auditory or visual hallucinations, alert and oriented in three spheres, with intact concentration, memory, good insight, fair judgment and an adequate fund of knowledge ([Tr. 431]).

In sum, the evidence would indicate that the symptom limitations relevant to these impairments are not as severe as alleged. If restricted to the performance of simple, routine tasks, conducted in a setting free of high production quotas or fast-paced production demands, which setting requires no more than occasional interaction with co-workers or the public, but which does not include customer service duties, the performance of tandem tasks [tasks requiring the joint or cooperative effort of a co-worker to complete], or the performance of tasks involving confrontation, conflict resolution, the direction or persuasion of others, and, which setting contemplates few [occurring only on occasion] changes in workplace tasks or duties, adequate allowance will have been made for these impairments.

At one point or another in the record (either in forms completed in connection with the application and appeal, in medical reports or records, or in the claimant's testimony), the claimant has reported the following daily activities: the claimant serves as caretaker for his elderly father ([Tr. 316]). Treatment notes generally report the claimant has no limitations in his activities of daily living ([Tr. 329]), ([Tr. 406]). He is able to attend to his self-care, to care for household pets, to help with household chores and to help take care of his home. The claimant games,

4

kayaks and bicycles for pleasure ([Tr. 329]), ([Tr. 343]). In short, the claimant has described daily activities, which are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations. While none of these activities, considered in isolation, would warrant or direct a finding of "not disabled"; when considered in combination, they strongly suggest that the claimant would be capable of engaging in the work activity contemplated by the residual functional capacity.

The following observations, recorded pursuant to Social Security Ruling 16-3p, have also informed the conclusions announced in this decision. Tremoring, reported and demonstrated by the claimant are clinically improved/resolved with distraction ([Tr. 344, 354]), and presenting on film, nevertheless give off no eleptiform discharges ([Tr. 347, 352]). The claimant entered formal psychological treatment in July 2021, reporting psychotic symptoms including paranoia, delusions and hallucinations ([Tr. 394-426]); however, overtly and covertly observed specifically for these symptoms, gives no indication of their presence ([Tr. 430]). The claimant has variously reported a sixth-grade education with receipt of special education services ([Tr. 199]), having attended some high school ([Tr. 410]), and being a high school graduate, with some college classes ([Tr. 697]). These observations are not intended to convey a deliberate attempt to deceive or mislead. Given a diagnosis of personality disorder, and particularly a cluster B personality disorder, it is all too likely that these represent a genuine part of the claimant's psychopathology. However, it does suggest the necessity of holding close to the objective record, and treating with utmost care, the subjective allegations of the claimant.

\* \* \*

The state agency medical consultants, James Greco, M.D., and W. Scott Bolz, M.D., each indicated that the claimant would be able to perform work at all exertional levels, but could not climb ladders, ropes or scaffolds, and should avoid all exposure to unprotected heights, dangerous moving machinery and commercial driving. Each of these doctors had the opportunity to review the evidence of record, to which each cited liberally in support of their conclusions and each is well versed in the terminology and analytical framework employed in the disposition of these claims. The record shows a claimant with a seizure disorder, but with recurrence of only three seizures since September 2019 ([Tr. 282]), ([Tr. 340]), ([Tr. 607]). The claimant escribes newer onset "tremoring", but which even the claimant has most recently described as episodic and "very minor" ([Tr. 607]). Clinical examinations have reported preserved strength and neurological function and coordination ([Tr. 343-344]), and the claimant has retained an array of activities of daily living of sufficient breadth to encompass service as a caretaker for his father, helping with household chores and taking care of the house ([Tr. 317]), bicycling and kayaking for pleasure ([Tr. 329]), ([Tr. 343]). Mild manipulative limitations have been included in respect of the claimant's tremors, but these opinions remain

5

otherwise consistent with, and supported by, the overall evidence of record and are persuasive.

The state agency psychological consultants, Courtney Zeune, Psy.D., and Lisa Foulk, Psy.D., each indicated that the claimant would be able to perform one-to-four-step tasks, if conducted in a setting free of extended concentration, with infrequent contact with others, where changes would be infrequent, and where there would be no fast pace or strict production quotas. Each of these doctors had the opportunity to review the evidence of record, to which each cited liberally in support of their conclusions and each is well versed in the terminology and analytical framework employed in the disposition of these claims. The record shows a claimant with chronic anxiety and depression. These would be expected to, the claimant reports ([Tr. 316-317]), and the record supports ([Tr. 318]), ([Tr. 326]) does, interfere, at least periodically, with the claimant's memory, focus and concentration. However, the claimant is described as possessed of average intellectual function ([Tr. 326]), sometimes with an average fund of knowledge ([Tr. 326]). Comprehension, and the ability to follow commands appear intact ([Tr. 317]), ([Tr. 344]). Memory function ([Tr. 343]), ([Tr. 431, 437]), attention and concentration ([Tr. 318]), ([Tr. 354]), ([Tr. 407]), ([Tr. 431, 437]), are reliably reported as normal, and even if his thoughts are racing, his thought process remains logical, relevant, goal-directed, and linear ([Tr. 409]), ([Tr. 431]). If restricted to the performance of simple, routine tasks, conducted free of the need to adhere to anxiety- or frustration-inducing production pressures, the claimant appears to have retained sufficient, residual, cognitive function to serve as "backstop" against these periodic deficits. The claimant reports self-isolating ([Tr. 317]) but retains the discernible ability to function in groups ([Tr. 430]). He has a forensic history ([Tr. 435]), but insignificant for violence towards others ([Tr. 316]). He is typically described in the record in pro-social terms ([Tr. 319]), ([Tr. 354]), ([Tr. 407]), ([Tr. 431]). If the frequency, and potential for escalation in the intensity, of his interaction with others is controlled, the claimant appears to have retained sufficient, residual, social function to engage in competitive work. The claimant has exhibited poor insight and judgment in a suicide attempt ([Tr. 437]). However, he did call for rescue ([Tr. 435]) and is typically described as possessed of fair-to-normal insight and judgment ([Tr. 318]), ([Tr. 407]), ([Tr. 431]). He is able to serve as caregiver to his elderly father ([Tr. 317]) and is independent with activities of daily living ([Tr. 329]), ([Tr. 406]). If restricted to the performance of simple, routine tasks, conducted free of the need to adhere to anxiety- or frustration-inducing production pressures, where he would not be expected to respond to constant changes, the claimant appears to have retained sufficient, residual, adaptive function to engage in competitive work. These opinions overstate, to mild degree, the claimant's residual cognitive and social abilities but remain, overall, consistent with, and supported by, the evidence of record and are persuasive.

The consultative psychological examiner, Kenneth Gruenfeld, Psy.D., indicated that the claimant would have some difficulties understanding, remembering and carrying out instructions, concentrating, persisting and maintaining pace, and

6

adapting to the stressors of day-to-day work, but would have no difficulties interacting with others. Dr. Gruenfeld examined the claimant on a single occasion and was reporting within the bounds of his professional certifications and specialty. As this opinion indicates limitations in three of the four, psychologically based, work-related areas of function, it is at least marginally consistent with, and supported by, the overall evidence of record, discussed in digest form in the preceding paragraph. However, this opinion overstates the claimant's social ability, and, as to the specific degree of work-related limitation that would appertain, this opinion is vague and therefore less than helpful. In consequence, the opinion is not persuasive.

(Tr. 21-25).

### C. Testimonial Evidence

#### 1. Claimant Angelo Comer

Comer testified at the hearing before the ALJ. (Tr. 38-48). In relevant part, Comer testified that he does not "really drive anymore." (Tr. 40). Comer and the ALJ had the following exchange regarding his ability to drive:

> [ALJ] And then, do you still have your driver's license even though you're not able to drive? Or do you not even have the license anymore.
>
> [Comer] Yeah. My license is still valid. I just choose not to. And then, they -- their opinion is basically like, if something happens, let's give it like, you know, maybe we'll say four months or five months, you know, to wait. But I kind of like -- I've just kind of stopped really, because I'm more just on the paranoid side of things happening. So I would rather not drive at the moment.
>
> [ALJ] Okay. But I guess that sort of begs the question for me, they say if something happens, give it four or five months, so, I mean, do you have those periods of time of four to five months where nothing happens, but you're still just not choosing? Or do you really not even have a four to five-month period ever where something isn't happening?
>
> [Comer] So, basically when the four to five-month period is up, usually I can drive, but I still get the jolts in my hands sometimes, so I do notice that when I do drive sometimes, I mean, I can usually control it when I'm driving, because my hand's kind of gripping the steering wheel a lot more. But my anxiety has went really up with driving recently, and -- some of my diagnosis, I don't know, it seems to get a little worse where I'm not ashamed of it anymore, so. I mean if I have to, I will, but I really don't enjoy it anymore, so.

(Tr. 41-42).

### 2. Vocational Expert

Gail Klier, a Vocational Expert ("VE"), also testified. (Tr. 48-53). The ALJ reminded the VE that Comer had no past relevant work and then posed a hypothetical. The ALJ asked the VE whether there were any jobs in the national economy for a hypothetical individual with Comer's age, education, and no past relevant work, who could perform at all exertional levels with the following limitations:

> [The individual] should never climb ladders ropes, and scaffolds.
>
> * * *
>
> And this individual should avoid unprotected heights, dangerous moving machinery, and no commercial driving.
>
> * * *
>
> This individual is able to perform simple routine tasks in a work environment where there are no tasks that involve high production quotas or fast paced productions. Where there is only occasional interaction with co-workers and the public. Where there are no work tasks that involve customer service duties, confrontation, conflict resolution, directing the work of others, or persuading others.
>
> Where there are no tandem tasks -- that is no tasks that require the joint or cooperative effort of the co-worker to complete the task. And where any changes in workplace tasks or duties are few, that is they occur only on occasion.

(Tr. 49-50).

The VE testified that the hypothetical individual could perform the following jobs at a medium exertion level: (i) hospital cleaner – DOT number 323.687-010, SVP - 2, and 48,797 jobs in the national economy; (ii) linen room attendant – DOT number 222.387-030, SVP - 2, and 5,162 jobs in the national economy; and (iii) cleaner II – DOT number 919.687-014, SVP - 1, and 51,462 jobs in the national economy. (Tr. 50-51). The VE also indicated that there were other jobs that the hypothetical individual could perform outside of the preceding list. *See*

8

(Tr. 51). The ALJ then added more limitations for the hypothetical individual and the VE testified that each of the following additional limitations posed by the ALJ would be work preclusive: (i) occasional handling and fingering bilaterally; (ii) off task greater than 10% of the time; and (iii) two or more times a month being tardy, absent, and/or leaving early. (Tr. 51-52). Comer's counsel did not object to the VE's testimony, nor did he pose any questions to the VE. (Tr. 52).

### III.    The ALJ's Decision

At Step Four, the ALJ determined that Comer had the residual functional capacity ("RFC") to perform work at all exertional levels, with the following exceptions:

> the claimant may frequently handle and finger with the bilateral upper extremities; the claimant may never climb ladders, ropes or scaffolds; the claimant must avoid all exposure to unprotected heights, dangerous moving machinery, and commercial driving; the claimant is limited to the performance of simple, routine tasks, conducted in a setting free of high production quotas or fast-paced production demands, which setting requires no more than occasional interaction with co-workers, or the public, but which does not include customer service duties, the performance of tandem tasks [tasks requiring the joint or cooperative effort of a co-worker to complete], or the performance of tasks involving confrontation, conflict resolution, the direction or persuasion of others, which setting contemplates few [occurring only on occasion] changes in workplace tasks or duties.

(Tr. 20).

At Step Five, the ALJ determined that there were jobs that existed in significant numbers in the national economy that Comer could perform, stating:

> The claimant's ability to perform work at all exertional levels has been compromised by nonexertional limitations. To determine the extent to which these limitations erode the occupational base of unskilled work at all exertional levels, the Administrative Law Judge asked the vocational expert whether jobs exist in the national economy for an individual with the claimant's age, education, work experience, and residual functional capacity. The vocational expert testified that given all of these factors the individual would be able to perform the requirements of representative occupations such as linen room attendant (#222.387-030), having a medium exertional level designation and a specific vocational preparation factor of two, with 5,162 such jobs existing in the national economy.

> Pursuant to SSR 00-4p, the undersigned has determined that the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles.
>
> Based on the testimony of the vocational expert, the undersigned concludes that, considering the claimant's age, education, work experience, and residual functional capacity, the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy.

(Tr. 25-26).

### IV. Request for Appeals Council Review

On March 29, 2022, Comer submitted a request for Appeals Council review. (Tr. 175-176). On April 20, 2022, he submitted a representative brief which, in relevant part, argued that the matter should be remanded for further proceedings because the ALJ erred in her determination that there was a significant number of jobs in the national economy that Comer could perform. *See* (Tr. 237). The brief stated:

> The ALJ's decision listed only one occupation that Mr. Comer could perform with the limitations set forth in the RFC. The decision lists only a linen room attendant, with 5,162 jobs in the national economy. Because these numbers do not represent significant jobs within the national economy, the Appeals Council should remand this matter for further proceedings.

(*Id.*).

### V. Law & Analysis

#### A. Standard of Review

The court reviews the Commissioner's final decision to determine whether it was supported by substantial evidence and whether proper legal standards were applied. 42 U.S.C. § 405(g); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence. *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003). And, even if a preponderance

10

of the evidence supports the claimant's position, the Commissioner's decision still cannot be overturned "'so long as substantial evidence also supports the conclusion reached by the ALJ.'" *O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x 409, 416 (6th Cir. 2020) (quoting *Jones*, 336 F.3d at 477); *see also Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (Substantial evidence "means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"). But, even if substantial evidence supported the ALJ's decision, the court will not uphold that decision when the Commissioner failed to apply proper legal standards, unless the legal error was harmless. *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and [when] that error prejudices a claimant on the merits or deprives the claimant of a substantial right."). And the court will not uphold a decision when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Charter*, 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-13000, 2012 U.S. Dist. LEXIS 157595, at *16 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked.").

   **B. Step Five: Significant Number of Jobs in the National Economy that Claimant Could Work**

  Comer contends that the ALJ erred at Step Five when she determined that jobs existed in significant numbers in the national economy which Comer could perform. ECF Doc. 11 at 8-11. Comer argues that the ALJ failed to meet the Commissioner's burden at Step Five because she found that Comer could only perform one job (linen room attendant), with 5,162 jobs in the national economy; but she provided no explanation as to why only 5,162 positions nationally

11

qualified as a "significant number." *Id.* at 8-10. Comer specifically cites *Hall v. Bowen*,[2] a case that provides factors for determining if a specific number of jobs is "significant," and argues that the *Hall* factors undermine the ALJ's finding, pointing to: (i) Comer's significant nonexertional limitations; (ii) his inability to travel, either by driving or public transportation; and (iii) the fact that linen room attendant jobs are isolated to large metro or destination areas. *Id.* at 8-11.

The Commissioner responds that the ALJ properly relied on the testimony of the VE to determine that Comer could perform work available in the national economy. ECF Doc. 12 at 5-6. The Commissioner further argues that the *Hall* factors are merely suggestions that an ALJ may choose to consider and the ALJ's decision in fact addressed many of these factors in her analysis of Comer's RFC. *Id.* at 6-7. Finally, the Commissioner contends that: (i) the VE identified 105,411 jobs in the national economy that Comer could perform; (ii) Comer did not object to the VE's testimony; and (iii) the Sixth Circuit has found as few as 2,000 jobs in the national economy to be a "significant number." *Id.* at 7-8. In his reply brief, Comer concedes that there is no set or defined number that qualifies as a significant number but argues that the *Hall* factors dictate that 5,162 jobs do not qualify as a significant number given the circumstances of this case. ECF Doc. 13.

At Step Five of the sequential evaluation process, the burden shifts to the Commissioner to produce evidence as to whether the claimant can perform a significant number of jobs in the national economy. *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 238 (6th Cir. 2002); 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). Under the regulations, "work which exists in the national economy" is defined as "work which exists in significant numbers either in the region where [claimant] lives or in several regions of the country." 42 U.S.C. § 1382(a)(3)(B). "Work

---

[2] 837 F.2d 272 (6th Cir. 1988).

exists in the national economy when there is a significant number of jobs (in one or more occupations) having requirements which [the claimant is] able to meet with [the claimant's] physical or mental abilities and vocational qualifications." 20 C.F.R. § 404.1566(b).

An ALJ may determine that a claimant has the ability to adjust to other work in the national economy by relying on a vocational expert's testimony that a hypothetical person with the claimant's abilities can perform specific jobs. *Howard*, 276 F.3d at 238. "There is no 'magic number' that qualifies as 'significant' for purposes of satisfying this prong of the disability inquiry." *Cunningham v. Astrue*, 360 F. App'x 606, 615 (6th Cir. 2010) (quoting *Hall*, 837 F.2d at 275). The Sixth Circuit has explained that "an ALJ must tailor the determination of what is significant to the facts of each claimant's case is why we have said that ALJs 'should consider many criteria in determining whether work exists in significant numbers.'" *Taskila v. Comm'r of Soc. Sec.*, 819 F.3d 902, 906 (6th Cir. 2016) (quoting *Hall*, 837 F.2d at 275). *Hall* sets forth the standard for reviewing an ALJ's "significant numbers" determination and lists some of the relevant factors:

> A judge should consider many criteria in determining whether work exists in significant numbers, some of which might include: the level of claimant's disability; the reliability of the vocational expert's testimony; the reliability of the claimant's testimony; the distance claimant is capable of travelling to engage in the assigned work; the isolated nature of the jobs; the types and availability of such work, and so on. The decision should ultimately be left to the trial judge's common sense in weighing the statutory language as applied to a particular claimant's factual situation.

*Hall*, 837 F.2d at 275.

The Sixth Circuit has clarified that the factors set forth in *Hall* were merely suggestions and not required elements. *Harmon v. Apfel*, 168 F.3d 289, 292 (6th Cir. 1999) ("*Hall* went on to state that these factors were suggestions only – the ALJ need not explicitly consider each factor."); *Mitchell v. Sec'y of Health & Human Servs.*, 902 F.2d 33 (Table), [published in full-

13

text format at 1990 U.S. App. LEXIS 6948, at *11-12] (6th Cir. May, 1, 1990) ("[The claimant] argues that the ALJ's failure to explicitly consider the factors delineated in *Hall* necessitates a remand. This argument is meritless, however, because the *Hall* court intended its stated factors as suggestions only."). The determination of what constitutes a significant number of jobs, "should ultimately be left to the trial judge's common sense in weighing the statutory language as applied to a particular claimant's factual situation." *Hall*, 837 F.2d at 275.

First, the court notes that the ALJ's decision reflects that she considered some of the *Hall* factors. Specifically, the ALJ considered: (i) the level of Comer's disability, *see* (Tr. 20-26); (ii) the reliability of Comer's testimony, *see* (Tr. 23, 25); (iii) the reliability of the VE's testimony, *see* (Tr. 25-26); and (iv) the types and availability of work available in the national economy that Comer could perform, *see* (Tr. 25-26). Even though the ALJ did not appear to consider "the distance claimant is capable of travelling to engage in the assigned work" or "the isolated nature of the jobs," this is not a reversible error because the *Hall* factors are merely suggestions and there is no requirement that the ALJ explicitly discuss any particular factor. *Harmon*, 168 F.3d at 292; *Mitchell*, 1990 U.S. App. LEXIS 6948, at *11-12; *see also Shepherd v. Comm'r of Soc. Sec.*, No. 2:20-cv-6576, 2021 U.S. Dist. LEXIS 224511, at *26 (S.D. Ohio Nov. 22, 2021) ("At no time, however, did the Sixth Circuit impose an articulation requirement.").

Moreover, Comer's arguments that these unaddressed factors undermined the ALJ's decision are both waived and lack substantial evidence. Comer's merits brief asserts that: (i) he "is not capable of travel, either by driving nor on public transportation again due to his enumerated impairments"; and (ii) the linen room attendant job is isolated in nature because it "only occurs in large hotel or resort facilities likely in large metro or destination areas." ECF

14

Doc. 11 at 10-11. But Comer never raised these issues before the agency. Comer's counsel never asked the VE about a limitation regarding an inability to travel, nor did he object to the ALJ's failure to raise the limitation in the hypothetical questions. *See* (Tr. 49-53). In Comer's brief before the Appeals Council, Comer's counsel generally argued that the determination of 5,162 jobs as a "significant number" was a reversible error, but it did not raise or mention the ALJ failing to consider Comer's alleged inability to travel or Comer's contentions about the isolated nature of the linen room attendant jobs. *See* (Tr. 237-238). "It is axiomatic that 'a court should not consider an argument that has not been raised in the agency proceeding that preceded the appeal.'" *Maloney v. Comm'r of Soc. Sec.*, 480 F. App'x 804, 810 (6th Cir. 2012) (quoting *City of Riverview v. Surface Transp. Bd.*, 398 F.3d 434, 443-44 (6th Cir. 2005)); *see also Maple v. Apfel*, 14 F. App'x 525, 537 (6th Cir. 2001) ("This Court will not review the ALJ's decision with respect to issues not properly raised at the administrative level."). Because Comer did not raise these arguments during administrative proceedings, Comer has waived these arguments. *See Ramsey v. Comm'r of Soc. Sec.*, 973 F.3d 537, 545 (6th Cir. 2020); *see also Maloney*, 480 F. App'x at 810 ("[The claimant] had to raise the issue to the agency, and had that opportunity during her administrative appeal to the Appeals Council. Her failure to do so constitutes a waiver.").

Even if these arguments had not been waived, there is no substantial evidence in the record to support them. The medical record demonstrates that Comer's doctors restricted him from driving for only a certain period of time after a seizure (usually several months), and they permitted him to drive after that time period lapsed without further incident. *See* (Tr. 287, 298, 362-363, 610). Comer's own testimony demonstrated that he: (i) has a valid driver's license; (ii) has the ability to drive himself; (iii) does drive himself on occasion, and (iv) prefers not to

15

drive himself and does little driving. (Tr. 40-42). This testimony belies Comer's assertion on appeal that he cannot drive himself. More importantly, there is no evidence or assertion in the record that Comer cannot use public transportation. The state agency medical consultants found at the initial and reconsideration stages that Comer was not significantly limited in his "ability to travel in unfamiliar places or *use public transportation*." (Tr. 61, 70) (emphasis added). Once again, Comer never challenged this finding before the agency. Put simply, there is no evidence in the record that Comer cannot drive or is unable to use public transportation – a claim asserted for the first time before this court. As for the contention that the linen room attendant positions are located in isolated areas: (i) on appeal, Comer has provided nothing more than his bare assertion that such positions are only available in large hotels or resort facilities that are only located in large metro or resort destination areas, ECF Doc. 11 at 10-11; and (ii) there is no evidence in the record to support this assertion. Thus, having already recognized that the ALJ considered several of the *Hall* factors, the ALJ's decision and analysis satisfied the requirements under *Hall*.

Second, the ALJ's "significant number" determination was supported by substantial evidence. The ALJ properly relied on the VE's testimony to support her "significant number" finding at Step Five. *See Howard*, 276 F.3d at 238; *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-547 (6th Cir. 2004); *Staymate v. Comm'r of Soc. Sec.*, 681 F. App'x 462, 469 (6th Cir. 2017). The VE listed three jobs in the national economy that a person with Comer's age, education, work experience, and RFC could perform, which totaled 105,421 jobs in the national economy (hospital cleaner – 48,797 jobs; linen room attendant – 5,162 jobs; cleaner II – 51,462 jobs). *See* (Tr. 50-51). The VE further testified that this was not an exhaustive list and that such a hypothetical person was able to perform other jobs not listed. (Tr. 51). Comer argues that the

ALJ's significant number determination relied solely on the linen room attendant job and excluded the other two positions provided by the VE (hospital cleaner and cleaner II). ECF Doc. 11 at 10. But the ALJ's decision does not reflect that the ALJ excluded these positions from consideration. At Step Five, the ALJ merely stated that the VE found the hypothetical individual could perform the requirements of "representative occupations" (which included the hospital cleaner, linen room attendant, and cleaner II positions) and listed one such position from that category – linen room attendant. (Tr. 25-26).

The wording of the ALJ's decision did not exclude the hospital cleaner and cleaner II positions. Nor did it discount the VE's testimony or give any indication that the ALJ was rejecting over 100,000 other jobs or other potential unlisted positions *sub silentio*. Comer has solely challenged the ALJ's significant number determination, while raising no challenge to the RFC or the VE's testimony (or the VE's opinion that a person with Comer's RFC could perform work with more than 105,000 jobs available in the national economy). *See* ECF Doc. 11. In essence, Comer's entire argument rests on his contention that the ALJ silently rejected the majority of the VE's opinion. But the wording of the ALJ decision and her analysis simply do not reflect an intention to discount or reject any of the VE's findings.

"Courts are generally guided by the numbers that have been found 'significant' in other cases." *Tackett v. Kijakazi*, Civil Action No. 7:20-90-KKC, 2021 U.S. Dist. LEXIS 218976, at *23 (E.D. Ky. Nov. 12, 2021) (citing *Schadenfroh v. Colvin*, No. 09-CV-223, 2014 U.S. Dist. LEXIS 42033, at *36 (S.D. Ind. Mar. 27, 2014)). Although there is no "magic number" for determining the number of jobs in the national economy that constitutes a significant number, courts have found significantly fewer than 100,000 jobs to be significant work in the national economy. *See Bishop v. Shalala*, 64 F.3d 662 (Table), No. 94-5375, [published in full-text

17

format at 1995 U.S. App. LEXIS 24624, at *5-7] (6th Cir. Aug. 15, 1995) (finding that 6,100 jobs nationally constituted a significant number); *Lewis v. Sec'y of Health & Human Servs.*, No. 94-1807, 1995 U.S. App. LEXIS 6078, at *3-4 (6th Cir. Mar. 22, 1995) (14,000 national jobs); *Nash v. Sec'y of Health & Human Servs.*, No. 94-5376, 1995 U.S. App. LEXIS 15129, at *7 (6th Cir. June 15, 1995) (70,000 national jobs); *Borgerson v. Comm'r of Soc. Sec.*, No. 3:20-CV-01820-JGC, 2021 U.S. Dist. LEXIS 253425, at *33 (N.D. Ohio Dec. 3, 2021) (38,000 national jobs); *Caviness v. Comm'r of Soc. Sec.*, No. 1:20-cv-292, 2021 U.S. Dist. LEXIS 141453, at *4 (W.D. Mich. July 29, 2021) (27,100 national jobs); *Dyer v. Comm'r of Soc. Sec.*, No. 1:14-cv-454, 2015 U.S. Dist. LEXIS 88226, at *21 (S.D. Ohio July 7, 2015) (74,470 national jobs); *Lash v. Comm'r of Soc. Sec.*, No. 12-13472, 2015 U.S. Dist. LEXIS 70760, at *8-9 (E.D. Mich. June 2, 2015) (collecting cases); *see also Garcia v. Comm'r, SSA*, 817 F. App'x 640, 649-50 (10th Cir. 2020) (20,500 to 22,000 national jobs); *Sanchez v. Comm'r of Soc. Sec.*, 705 F. App'x 95, 99 (3rd Cir. 2017) (18,000 national jobs); *Johnson v. Chater*, 108 F.3d 178, 180 (8th Cir. 1997) (10,000 national jobs); *Kimberly T. v. Kijakazi*, No. 3:20-CV-1543-SI, 2022 U.S. Dist. LEXIS 57494, at *24-25 (D. Or. Mar. 29, 2022) (15,500 national jobs); *Dorothy B. v. Berryhill*, No. 18 CV 50017, 2019 U.S. Dist. LEXIS 91276, at *23 (N.D. Ill. May 31, 2019) (17,700 national jobs).

Even if the court were to accept Comer's argument that the ALJ's determination was limited to the linen room attendant position – and its 5,162 jobs in the national economy – there was still substantial evidence supporting the ALJ's "significant number" finding. In *Nejat v. Comm'r of Soc. Sec.*, the Sixth Circuit held that 2,000 jobs constituted a significant number of jobs in the national economy, citing other cases that found 2,500, 2,000, 1,200, and 500 jobs to be significant. 359 F. App'x 574, 579 (6th Cir. 2009) (collecting cases). In *Taskila v. Comm'r of*

18

*Soc. Sec.*, the Sixth Circuit held that 6,000 jobs were a sufficient number to withstand the plaintiff's challenge on appeal. 819 F.3d 902, 905-06 (6th Cir. 2016). Thus, even if the ALJ erred by not discussing the hospital cleaner and cleaner II positions, such an error was harmless. Moreover, remand would ultimately be an idle and useless formality, because the ALJ would only need to add discussion of the VE's evidence concerning the hospital cleaner and cleaner II positions, which Comer never challenged. *See Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 507 (6th Cir. 2006) ("No principle of administrative law or common sense requires [a reviewing court] to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result." (quoting *Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989)); *see also Kobetic v. Comm'r of Soc. Sec.*, 114 F. App'x 171, 173 (6th Cir. 2004) (noting that in such instances courts are not required to "convert judicial review of agency action into a ping-pong game").

In summation, the ALJ weighed the record evidence, considered multiple *Hall* factors, and concluded that Comer was capable of performing work in the national economy that existed in significant numbers based on the VE's testimony, which evidenced over 105,000 jobs in the national economy that a person with Comer's limitations could perform. *See* (Tr. 25-26, 50-51). Nothing more was required of the ALJ, and the significant number determination should be ultimately left to the common sense of the ALJ. *See Hall*, 837 F.2d at 275. Because substantial evidence supported the ALJ's significant number finding – whether based on 5,162 or 105,000+ national jobs – and because that finding did not conflict with Sixth Circuit precedent, the court must affirm the ALJ's disability finding.

## VI. Conclusion

Because the ALJ applied proper legal standards and reached a decision supported by substantial evidence, the Commissioner's final decision denying Comer's application for SSI is AFFIRMED.

**IT IS SO ORDERED.**

Dated: December 28, 2023

                                                      Thomas M. Parker
                                          United States Magistrate Judge